**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |
|---|---|
| SARAH MICHELLE TADIJANAC, | CASE NO. 1:25-cv-01122 |
| Plaintiff, | JUDGE BRIDGET MEEHAN BRENNAN |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **<u>REPORT AND RECOMMENDATION</u>** |
| Defendant. | |

Plaintiff Sarah Michelle Tadijanac seeks judicial review of the final decision of

Defendant Commissioner of Social Security denying her applications for Child Insurance

Benefits ("CIB") and Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned

Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM**

the Commissioner's final decision.

### I. Procedural History

Plaintiff filed her CIB and SSI applications on November 17, 2022, alleging an onset date

of September 8, 2022.  (Tr. 17.)  She alleged disability due to ulcerative colitis, bloody stool,

abdominal cramps and pain, nausea, weight loss, needing to be in close proximity to a restroom,

depression, anxiety, insomnia, postural tachycardia syndrome ("POTS"), irritable bowel

syndrome ("IBS"), hypokalemia, and Vitamin B12 and D deficiencies.  (Tr. 117, 133, 271.)  Ms.

Tadijanac's applications were denied initially and upon reconsideration (Tr. 113-22, 130-37),

1

and she requested a hearing (Tr. 139-41). After conducting a hearing on Ms. Tadijanac's claims (Tr. 37-65), an Administrative Law Judge ("ALJ") issued a decision denying her applications on May 24, 2024 (Tr. 14-36). On April 4, 2025, the Appeals Council denied Ms. Tadijanac's request to review the ALJ decision, making the May 24, 2024 decision the final decision of the Commissioner. (Tr. 1-6.)

Ms. Tadijanac filed her Complaint on May 30, 2025, challenging the Commissioner's final decision denying her applications for disability benefits. (ECF Doc. 1.) The matter is fully briefed. (ECF Docs. 7, 9 & 10.) Ms. Tadijanac identifies two assignments of error (legal issues) in her opening brief:

1. The ALJ erred in his evaluation of Plaintiff's mental functioning. The ALJ's findings regarding social interaction are unsupported by substantial evidence. The ALJ failed to evaluate the prior administrative medical findings and consultative examination pursuant to the revised regulations.

2. The ALJ failed to evaluate the persuasiveness of Plaintiff's symptoms pursuant to SSR 16-3p. The ALJ erred when failing to explain additional limitations relating to bathroom breaks should not be credited.

(ECF Doc. 7.)

## II. Evidence

### A. Personal, Educational, and Vocational Evidence

Ms. Tadijanac was born in 2003 and was 19 years old on the alleged onset date, making her a younger individual, age 18-49, on the alleged disability onset date. (Tr. 30, 267.) She has a high school education. (Tr. 30, 272.) She worked part-time in the past as a cashier and store laborer. (Tr. 58-89, 272.)

**B.      Medical Evidence**

**1.      Relevant Treatment History**

In early September 2022, Ms. Tadijanac sought treatment at the emergency room multiple times for abdominal pain, constipation, vomiting, nausea, and diarrhea.[1]  (Tr. 352, 358, 387, 566, 572, 656.)  She reported bloody stools at times.  (Tr. 566.)  A September 11, 2022 CT scan of the abdomen and pelvis showed: mild circumferential mucosal wall thickening of the proximal colon, nonspecific in etiology and possibly representing inflammatory or infectious process, with no signs of bowel obstruction or free air; and subcentimeter mesocolonic lymph nodes, none reaching pathological size.  (Tr. 557-59, 577.)  On the morning of September 11, 2022, Ms. Tadijanac rated her pain a 7 out of 10.  (Tr. 566.)  She was diagnosed with acute colitis, abdominal pain, and hypokalemia (Tr. 578) and prescribed antibiotics and steroids (Tr. 656).  She returned to the emergency room later that same day, saying she had not made it to the pharmacy to pick up her prescriptions and was concerned she was not feeling any better.  (*Id*.)  Her pain level was a 10 out of 10.  (Tr. 650.)  She said she was unable to eat or drink and had lost fifty pounds since December.  (Tr. 656.)  She was administered IV antibiotics and steroids and given Phenergan.  (Tr. 658.)  She said she would be able to pick up her prescriptions the next day and she was instructed to follow up with gastroenterology.  (*Id*.)

On September 16, 2022, Ms. Tadijanac presented to Lora Harris, APRN-CNP, at Akron Children's Hospital for follow up after being treated in the emergency room.  (Tr. 386-87.)  She was given a letter excusing her from work until she could be seen and was cleared by a gastroenterologist.  (Tr. 387.)  Ms. Tadijanac reported there were times when she felt better when on her medication, but she said she also had "flare ups."  (*Id*.)  She was able to keep some food

---

[1] She presented to Avita Ontario Emergency Department on September 6 and September 9 (Tr. 352, 358) and she presented to University Hospitals on September 11 in the morning and later that same day (Tr. 566, 656.)

down while on steroids.  (*Id*.)  She continued to have blood in her stools, but the frequency of her bowel movements had decreased.  (*Id*.)  She reported more anxiety and depression due to her new diagnosis of colitis and dietary changes.  (*Id*.)  On examination, her abdomen was soft, but with mild abdominal tenderness in the lower abdomen.  (Tr. 388.)  There was no distension, mass, or hepatosplenomegaly.  (*Id*.)  Ms. Tadijanac was scheduled to see gastroenterologist Dale Thomae, D.O., at University Hospitals and was advised to continue with her prescribed medication.  (Tr. 387.)

On September 19, 2022, Ms. Tadijanac established care with Dr. Thomae.  (Tr. 451-53.) She reported her diarrhea and bleeding had stopped since completing her Prednisone prescription, but she still had a lot of abdominal pain, and she felt constipated and bloated.  (Tr. 451.)  On examination, her abdomen was soft and non-tender.  (Tr. 453.)  Bowel sounds were normal.  (*Id*.)  Her bilateral lower quadrants were tender without rebound, guarding, or mass, and there was no hepatomegaly or splenomegaly.  (*Id*.)  Dr. Thomae ordered a colonoscopy and prescribed Prednisone.  (Tr. 451.)

Ms. Tadijanac returned to Dr. Thomae on October 18, 2022.  (Tr. 448-50.)  Her mother accompanied her to the appointment.  (Tr. 448.)  Ms. Tadijanac reported that she lost her job due to her illness and had been unable to work consistently for the prior four months due to her bowel issues.  (*Id*.)  Ms. Tadijanac also reported concerns about starting a job because she still had to go to bathroom eight to ten times per day.  (*Id*.)  Dr. Thomae told her and her mother that "there would be no reason why she could not work and have a normal life" once her disease was under control.  (*Id*.)  The colonoscopy showed disease activity that was mild to moderate and consistent with ulcerative colitis.  (Tr. 448, 458.)  On examination, her abdomen was soft and non-tender.  (Tr. 450.)  Bowel sounds were normal and there was no hepatomegaly or

4

splenomegaly. (*Id.*) Dr. Thomae prescribed dicyclomine (Bentyl) for her ulcerative colitis. (Tr. 448.) Ms. Tadijanac had previously been prescribed mesalamine but had only recently picked up the prescription. (*Id.*) Dr. Thomae wanted to see Ms. Tadijanac in six weeks to see how she was responding to oral mesalamine. (*Id.*)

On November 2, 2022, Ms. Tadijanac presented to Meredith Hale, D.O., at University Hospitals to establish care with a primary care physician. (Tr. 457-60.) Dr. Hale noted a history of ulcerative colitis, anxiety and depression, and dysmenorrhea. (*Id.*) Ms. Tadijanac reported that she stopped taking Prednisone due to side effects that included dizziness, lightheadedness, nausea, and suicidal ideation. (Tr. 457-58.) She also reported increased anxiety due to her new ulcerative colitis diagnosis and job loss. (Tr. 457.) She said she had not yet noticed a difference in her colitis symptoms since starting mesalamine. (*Id.*) Her examination noted mild diffuse tenderness in the abdomen with normal active bowel sounds. (Tr. 460.) Her mood and affect were normal. (*Id.*) Dr. Hale prescribed hydroxyzine for anxiety and depression and referred Ms. Tadijanac to Talbot Health for evaluation and treatment of her anxiety. (Tr. 457.)

During a November 15, 2022 telephone visit with Dr. Hale for complaints of sore throat, swollen lymph nodes, and cough, Ms. Tadijanac's review of systems was positive for diarrhea and nausea. (Tr. 454.) With respect to her anxiety and depression, Ms. Tadijanac reported significant improvement in her symptoms with hydroxyzine. (*Id.*)

On November 18, 2022, Ms. Tadijanac participated in a telephonic appointment with Jennifer Koogan, MS, LPCC, LICDC at Talbot Clinical Services of Ohio ("Talbot"). (Tr. 485-504.) Ms. Tadijanac reported that she babysat her roommate's child in exchange for rent, but was unable to complete work tasks at her past jobs due to her medical condition. (Tr. 492.) She reported a history of depression and anxiety since she was eleven or twelve years old and a

5

history of verbal and physical abuse. (Tr. 500.) She admitted to suicidal thoughts less than a week prior. (Tr. 494.) She reported trouble understanding, concentrating, and remembering due to anxiety/depression. (*Id*.) On mental status examination, Ms. Tadijanac was calm, friendly, and cooperative. (Tr. 497, 498.) She had a euthymic affect and anxious and depressed/sad mood. (Tr. 497.) Her speech was rapid and tangential. (*Id*.) Her thought process was logical. (*Id*.) Her impulse control, insight, and judgment were fair. (Tr. 497, 498.) Her cognition was intact. (Tr. 498.) Her appearance, hygiene, eye contact, build, and psychomotor activity could not be assessed because the appointment was conducted via telephone. (*Id*.) She reported that she enjoyed making music, singing, playing the ukulele, and spending time with her cats. (Tr. 501.) She was diagnosed with: major depressive disorder, recurrent severe without psychotic features; generalized anxiety disorder; and post-traumatic stress disorder, unspecified. (Tr. 501-02.) Ms. Koogan recommended counseling, case management services, and a psychiatric evaluation. (Tr. 502.) A treatment plan, including group/individual therapy twice per week and psychotherapy once per week, was finalized on December 9, 2022. (Tr. 505-10.)

On November 29, 2022, Ms. Tadijanac returned to Dr. Thomae for follow up. (Tr. 466-68.) She reported she was doing okay with Lialda (mesalamine) and her diarrhea and bleeding had improved, but she continued to have occasional abdominal discomfort, nausea, constipation, and diarrhea. (Tr. 466.) Her October 3 colonoscopy showed diffuse inflammation throughout the colon with ulcerative colitis, cryptitis, and crypt abscess. (*Id*.) Ms. Tadijanac's abdominal examination showed a soft non-tender abdomen, normal bowel sounds, and no hepatomegaly or splenomegaly. (Tr. 468.)

On January 4, 2023, Ms. Tadijanac presented to the emergency room at University Hospitals with complaints of left quadrant pain and bloody stools for a week. (Tr. 740, 744.)

She reported her October 2022 ulcerative colitis diagnosis.  (*Id*.)  She rated her pain a 4 out of 10.  (Tr. 740.)  She reported taking anti-inflammatory medication for the last three to four months and taking Tylenol for her more recent pain.  (*Id*.)  Her examination noted generalized tenderness in the abdomen with the greatest tenderness in the left lower quadrant.  (Tr. 745.) There were tears near the rectum.  (Tr. 750.)  Ms. Tadijanac's laboratory studies were unremarkable and a CT scan of her abdomen and pelvis was normal with no active findings of ulcerative colitis.  (Tr. 729, 750.)  Ms. Tadijanac was diagnosed with rectal bleeding and left lower quadrant pain.  (Tr. 750.)  The findings were discussed with Dr. Thomae, who recommended that Ms. Tadijanac be placed on Proctofoam.  (Tr. 750.)

On January 16, 2023, Ms. Tadijanac returned to Dr. Thomae for follow up after her recent emergency room visit.  (Tr. 519-22.)  She had not filled her prescription for Proctofoam because insurance had not approved it.  (Tr. 520.)  She was taking sitz baths and using Preparation H, which helped with the rectal bleeding, but she continued to have some pain.  (*Id*.)  Dr. Thomae indicated Ms. Tadijanac had "done amazingly well with oral mesalamine."  (*Id*.)  She denied abdominal pain or bloating.  (*Id*.)  Ms. Tadijanac's abdominal examination showed a soft non-tender abdomen, normal bowel sounds, and no hepatomegaly or splenomegaly.  (Tr. 522.)

Five months later, on June 8, 2023, Ms. Tadijanac returned to Dr. Thomae for a three-month follow up appointment.  (Tr. 523.)  Dr. Thomae noted that she had mixed IBS with underlying ulcerative colitis.  (*Id*.)  He felt that her ulcerative colitis was in remission.  (*Id*.)  Ms. Tadijanac was using psyllium seed to help with her constipation because she could not afford Metamucil.  (*Id*.)  She reported that her stool had been inconsistent.  (*Id*.)  She felt her fissure had opened again and she was having pain and blood with bowel movements.  (*Id*.)  She started using a previously prescribed cream and it was helping.  (*Id*.)  Dr. Thomae advised Ms. Tadijanac to resume Bentyl twice daily and to continue psyllium seed.  (*Id*.)  He also advised her to continue

stress reduction techniques.  (*Id.*)  Ms. Tadijanac's abdominal examination showed a soft non-tender abdomen, normal bowel sounds, and no hepatomegaly or splenomegaly.  (Tr. 526.)

On August 21, 2023, Ms. Tadijanac presented to the emergency room at University Hospitals complaining of abdominal pain with nausea/vomiting and rectal bleeding starting that morning.  (Tr. 907.)  She reported a history of ulcerative colitis with her last flare occurring in January 2023.  (Tr. 911.)  She rated her pain a 7 out of 10.  (Tr. 907.)  A CT scan of the abdomen and pelvis showed evidence of mild inflammatory changes of the rectal area.  (Tr. 899-901, 912.)  After discussions with Dr. Thomae, a steroid and an antacid were recommended.  (Tr. 912, 933.)

Ms. Tadijanac continued to receive mental health services through Talbot and a treatment plan was approved on August 22, 2023 (1164-70), which included group/individual therapy once per week (Tr. 1169).  On December 11, 2023, Ms. Tadijanac had an annual diagnostic evaluation with Raven Rush, LPCC, at Talbot via telephone.  (Tr. 1116-32.)  LPCC Raven noted that she had symptoms relating to her "medical condition, anxiety, PTSD, and depression" and continued to receive services through Talbot, including therapy and case management services.  (Tr. 1116.)

On December 21, 2023, Dr. Thomae ordered infliximab infusions for treatment of Ms. Tadijanac's ulcerative colitis with a start date of February 23, 2024.  (Tr. 1063-79.)

On January 22, 2024, Ms. Tadijanac sought assistance from her case manager, Nicole Hartge, LCDCW, QMHS, at Talbot to obtain insurance authorization for the infusions ordered by Dr. Thomae.  (Tr. 1135.)  Ms. Tadijanac expressed frustration at the process and felt she had been treated poorly by someone at the infusion center when she contacted them regarding the insurance authorization.  (*Id.*)  Ms. Harge encouraged Ms. Tadijanac to reach out to the insurance company and agreed to assist with further outreach if necessary.  (*Id.*)

8

On January 26, 2024, Ms. Tadijanac presented to the emergency room at University Hospitals.  (Tr. 1003.)  She complained of worsening abdominal pain and reported occasional rectal bleeding and vomiting with nauseousness.  (*Id*.)  She had "noticed an increase in her pain with [a] recent steroid taper," noting that her pain worsened "as she dropped down below 30 mg."  (*Id*.)  On examination, her bowel sounds were normal, there was no distension, and her abdomen was soft, but there was generalized abdominal tenderness.  (Tr. 1005.)  She was cooperative with normal attention, perception, behavior, speech, mood, affect, thought content, cognition, memory, and judgment.  (Tr. 1005-06.)  A CT scan showed "questionable colitis or just simple mild inflammation."  (Tr. 1006.)  Dr. Thomae recommended an increase to 40 mg of Prednisone daily throughout the weekend, then back down to 30 mg, with a follow up at his office.  (*Id*.)  He also recommended a steroid cream to help with the rectal bleeding.  (*Id*.)  Ms. Tadijanac was discharged home in stable condition.  (*Id*.)

Ms. Tadijanac returned to Dr. Thomae for follow up on February 16, 2024.  (Tr. 1182-83.)  Dr. Thomae noted that they had discussed starting biologic therapy over the past twelve months, and indicated that Ms. Tadijanac was ready to start the infusions because she continued to require intermittent doses of steroids with mesalamine to control her symptoms, and her diarrhea and rectal bleeding returned when she attempted to wean off steroids.  (Tr. 1182.)  She was steroid dependent and currently on 20 mg daily.  (*Id*.)  Ms. Tadijanac's insurance denied Entyvio, which was Ms. Tadijanac's preferred medication, but approved the generic, infliximab.  (*Id*.)  Her insurance company required her to fail the generic infliximab before considering alternative therapies.  (*Id*.)  When Ms. Tadijanac received her first infusion of infliximab, she initially tolerated it.  (Tr. 1184.)  But once the rate was increased, she started to feel hot, nauseated, anxious, and jittery, and the infusion was stopped.  (*Id*.)

9

On March 21, 2024, Ms. Tadijanac presented to the emergency room at University Hospitals complaining of worsening abdominal pain. (Tr. 1185-88.) She reported having an ulcerative colitis flareup since January and being on steroids since then. (Tr. 1185.) She reported bloody stools, diffuse lower quadrant pain, nausea, and vomiting. (*Id*.) She said she recently tried Remicade (infliximab) but had not tolerated it, so Dr. Thomae was seeking approval of a different biologic. (*Id*.) On examination, her abdomen was protuberant and soft with no mass. (*Id*.) Bowel sounds were normal and there was no distension. (*Id*.) Abdominal tenderness was noted in the right lower quadrant, suprapubic area, and left lower quadrant. (*Id*.) There was no right CVA tenderness, left CVA tenderness, guarding or rebound. (*Id*.) Ms. Tadijanac was cooperative with normal attention, perception, behavior, speech, mood, affect, thought content, cognition, memory, and judgment. (Tr. 1186.) A CT of the abdomen and pelvis showed: a history of ulcerative colitis with no evidence of active ulcerative colitis; no acute abdominal or pelvic pathology; and constipation. (Tr. 1188.) Ms. Tadijanac was diagnosed with generalized abdominal pain. (*Id*.) She was provided Bentyl and Norco for abdominal pain and discharged home. (*Id*.)

On March 29, 2024, Ms. Tadijanac followed up with Dr. Hale regarding her abdominal pain. (Tr. 1189-93.) She also complained of a recent flare of low back pain and a rash. (Tr. 1189.) Dr. Hale noted that Ms. Tadijanac's Prednisone had been increased back to 30 mg and the plan was to start her on an Entyvio trial pending insurance approval. (*Id*.)

At the administrative hearing on April 29, 2024, Ms. Tadijanac testified that her insurance company finally approved the medication her doctor recommended, and she had started infusions in March 2024. (Tr. 47.) Ms. Tadijanac's treatment records reflect infusion

10

appointments on March 12, March 29, and April 12, 2024.  (Tr. 1200-01.)  When asked at the hearing if the infusions had helped, Ms. Tadijanac said: "So, far, they're doing okay."  (Tr. 47.)

### 2. Opinion Evidence

#### i. State Agency Psychological Consultant Opinion Evidence

On initial review, on May 27, 2023, state agency psychological consultant Ellen Rozenfeld, Psy.D., completed a Psychiatric Review Technique ("PRT") (Tr. 69-70, 79-80) and Mental RFC Assessment (Tr. 72-74, 82-84).  In the PRT, Dr. Rozenfeld opined that Ms. Tadijanac had mild limitations in her ability to understand, remember, or apply information and moderate limitations in her ability to: interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  (Tr. 69-70, 79-80.)  Dr. Rozenfeld opined that Ms. Tadijanac "would be somewhat restricted by symptoms but would not be wholly compromised in the ability to function in a work setting."  (Tr. 70, 80.)  More specifically, Dr. Rozenfeld opined that she had: no understanding or memory limitations; sustained concentration and persistence limitations, but was capable of "completing simple and detailed work-related tasks"; social interaction limitations, but could "relate on a superficial level with occasional public contact"; adaptation limitations, but "would be suitable for work that does not require changing tasks from day to day, but rather has a fairly regular set of job duties and expectations."  (Tr. 73-74, 83-84.)

On reconsideration, on October 11, 2023, state agency psychological consultant Aracelis Rivera Castro, Psy.D., completed a PRT (Tr. 90-91, 103-04) and Mental RFC Assessment (Tr. 94-96, 107-09).  Dr. Castro affirmed Dr. Rozenfeld's findings in the PRT, except that Dr. Castro found no limitations in her ability to understand, remember, or apply information.  (Tr. 90, 103.)  With respect to the Mental RFC Assessment, Dr. Castro concluded that the "initial RFC findings

[were] supported and consistent with medical evidence on file, including updated progress notes and additional CE evidence." (Tr. 96, 109.)

### ii. State Agency Medical Consultant Opinion Evidence

On initial review, on January 14, 2023, state agency medical consultant Indira Jasti, M.D., completed a Physical RFC Assessment. (Tr. 71-72, 81-82.) Dr. Jasti opined that Ms. Tadijanac could: lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; frequently climb ramps/stairs; occasionally climb ladders/ropes/scaffolds; and occasionally crawl. (Tr. 71-72, 81-82.) Dr. Jasti also opined that Ms. Tadijanac must avoid concentrated exposure to hazards (machinery, heights, etc.) due to ulcerative colitis, cramps, and abdominal pain. (Tr. 72, 82.)

On reconsideration, on July 28, 2023, state agency medical consultant Elizabeth Das, M.D., completed a Physical RFC Assessment. (Tr. 93-94, 106-07.) Dr. Das opined that Ms. Tadijanac could lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; occasionally climb ramps/stairs; never climb ladders/ropes/scaffolds; frequently balance; and occasionally stoop, kneel, crouch, and crawl. (*Id.*) Dr. Das also opined that Ms. Tadijanac must avoid all exposure to unprotected heights and hazardous moving machinery, and must avoid concentrated exposure to extreme cold, extreme heat, wetness, and humidity. (Tr. 94, 107.) Dr. Das explained that the initial findings were partially supported and consistent with the medical evidence of record, but concluded that updated medical evidence showing a diagnosis of POTS and complaints of presyncopal episodes supported further restrictions than those included in the initial findings. (*Id.*)

12

### iii.     Consultative Examiner Opinion Evidence

*James C. Tanley, Ph.D.*

On May 2, 2023, Ms. Tadijanac presented to James C. Tanley, Ph.D., for a consultative psychological evaluation conducted via video.  (Tr. 512-18.)  Her chief complaints were ulcerative colitis, torn rotator cuff, pinched right sciatic nerve, nausea, history of mental and physical abuse in her childhood, and racing heart with sweating, uncontrollable shaking, and her mind either blanking or racing.  (Tr. 512.)  She reported seeing a therapist since October 2022.  (Tr. 513.)  She remained symptomatic but she said her medication, which included hydroxyzine and mesalamine, helped.  (Tr. 512, 515.)  Her appetite was okay, but her sleep was not good due to anxiety.  (Tr. 513.)  As far as her "social relations," Ms. Tadijanac reported she was "do[ing] well with getting along" but she had "little desire to reach out because of [her] anxiety."  (*Id*.)  When discussing her past work, she said she had cried due to job stress.  (*Id*.)  During the mental status examination, Ms. Tadijanac reported a history of anxiety.  (Tr. 514.)  Otherwise, Ms. Tadijanac's mental status findings were normal, including cooperative behavior, normal speech and thoughts, intact memory, and average verbal intellectual functioning.  (Tr. 514-15.)  Ms. Tadijanac was diagnosed with panic disorder.  (Tr. 515.)

Dr. Tanley opined that Plaintiff had no problems understanding, remembering, or carrying out instructions.  (Tr. 516.)  As to Plaintiff's ability to maintain attention and concentration and to maintain persistence and pace to perform simple and multistep tasks, he opined she was unimpaired during the interview and "would be expected to show little or no difficulty with tasks of increasing complexity and multistep tasks."  (*Id*.)  However, if her "panic problems [were] to worsen, they could negatively impact th[e] [concentration and persistence] domain by interfering with her ability to focus and to concentrate."  (*Id*.)  With respect to Ms.

13

Tadijanac's abilities and limitations in responding appropriately to supervision and coworkers in a work setting, Dr. Tanley observed that Ms. Tadijanac "made an unremarkable social presentation" that day, but noted that she also expressed having "little desire to reach out" due to her anxiety despite reporting that she did "well with getting along." (*Id*.) Given her reported lack of desire to reach out due to anxiety and "her other problems with panic," Dr. Tanley opined that Ms. Tadijanac "would likely be at some risk trying to deal with the social aspects of work." (*Id*.) As to Ms. Tadijanac's abilities and limitations in responding appropriately to work pressures in a work setting, Dr. Tanley found there was "no reported history of mental or emotional deterioration in response to work exposure," but he opined that "[h]er current panic problems could lower her frustration tolerance and put her at some degree of risk for the pressures of work." (*Id*.)

#### *Andrea VanEstenberg, Ph.D.*

On October 3, 2023, Ms. Tadijanac presented to Andrea VanEstenberg, Ph.D., for a consultative psychological evaluation conducted via video. (Tr. 540-45.) She reported applying for disability due to her ulcerative colitis diagnosis, her POTS diagnosis, and depression and anxiety. (Tr. 540.) Other reported physical conditions included vision issues, stomach problems, nausea, diarrhea, cardiac issues, and headaches. (Tr. 541.) She received mental health services and psychotropic medication from her primary care physician, and had participated in weekly telephone counseling sessions over the past year. (Tr. 542.) On a typical day, she took her medication after waking up and had to go to the bathroom with discomfort and pain for 20 minutes. (*Id*.) She would go back to bed and spend the rest of the day letting the dogs out while her mom was at work, ordering groceries, watching television, and wasting time on the internet and playing games. (*Id*.)

14

On examination, Ms. Tadijanac was dressed appropriately, made and maintained eye contact, and did not demonstrate any bizarre behaviors or motor problems. (*Id*.) Her speech was normal. (*Id*.) She was cooperative and pleasant, and described her mood as "okay." (*Id*.) She showed no signs of irritability. (*Id*.) She reported suicidal thoughts, but denied ideation. (*Id*.) She did not report hallucinations. (*Id*.) She reported life-long concentration and memory problems. (*Id*.) She also reported a history of depression, with reported symptoms of social isolation and withdrawal, crying episodes, and decreased motivation. (*Id*.) She said she had problems with anxiety for years. (Tr. 542-43.) She also reported a history of temper problems. (Tr. 543.) She appeared to be functioning within the average range of adult intellectual ability, and she demonstrated adequate insight and judgment. (*Id*.) Dr. VanEstenberg diagnosed unspecified anxiety disorder and unspecified depressive disorder. (*Id*.)

Dr. VanEstenberg opined that Plaintiff had no limitations in: understanding, remembering, or carrying out instructions; maintaining attention and concentration; and maintaining persistence and pace to perform simple and multistep tasks. (Tr. 544.) As to Ms. Tadijanac's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting, Dr. VanEstenberg noted that Ms. Tadijanac "report[ed] social difficulties regarding avoidance and anxiety," but also observed that she "made an unremarkable social presentation in [the] virtual setting." (Tr. 545.) With respect to Ms. Tadijanac's abilities and limitations in responding appropriately to work pressures in a work setting, Dr. VanEstenberg opined based on her presentation during the evaluation and "report of anxiety, depression, temper, and inattention" that she was "expected to respond to typical and expected work stressors in a more solitary position with a highly simplistic and repetitive task." (*Id*.) Dr. VanEstenberg also observed that Ms. Tadijanac "currently accesses outpatient services and is

15

maintained" and opined that her "ability to cope with the stress and pressures associated with day-to-day basic work activity would not be compromised with a highly simplistic and repetitive single-step task in a more socially isolated or remote position." (*Id*.)

## C.    Plaintiff's Function Report

In her function report (Tr. 284-91), Ms. Tadijanac stated that stomach and bowel issues required her to have immediate access to a bathroom and caused weakness (Tr. 284).  She also reported that her participation in social activities had changed because she had anxiety and was concerned about having a flare up.  (Tr. 288.)  She said she did not handle stress well.  (Tr. 290.)

## D.    Hearing Testimony

At the hearing on April 29, 2024, Ms. Tadijanac testified in response to questions from the ALJ and her attorney.  (Tr. 42-57.)  A Vocational Expert ("VE") also testified.  (Tr. 58-63.)

The VE testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination (Tr. 23, 59-60), could not perform Ms. Tadijanac's past work as a store laborer (Tr. 60).  But there were jobs available at the light exertional level that the individual could perform, including mail clerk, routing clerk, and small products assembler.  (*Id*.)  The VE also testified that there were jobs the hypothetical individual could perform at the sedentary exertional level, including document preparer, surveillance system monitor, and tube operator.  (Tr. 60-61.)  If the hypothetical individual needed two to three bathroom breaks during an eight-hour workday, beyond the typical breaks of two 15-minute breaks and a 30-minute lunch break, the VE testified that an approved accommodation would be necessary.  (Tr. 61-63.)

16

### III.     Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.     If the claimant is doing substantial gainful activity, he is not disabled.

2.     If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.     If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform other work available in the national economy. *Id.*

With respect to CIB, an adult whose parent is entitled to old age or disability benefits can receive CIB if the "child was under a disability ... at the time he attained the age of 18 or . . . at or prior to the time he attained . . . the age of 22." 42 U.S.C. § 402(d)(1)(G); *see* 20 C.F.R. § 404.350(a)(5); *Jones v. Sec'y of Health & Human Servs.*, 89–1603, 1990 WL 17265, at * 1 n.1 (6th Cir. Feb. 27, 1990) (Section 402(d) "provides that a child of an individual entitled to old age or disability insurance benefits is entitled to Child's Insurance Benefits if he is under a disability (as defined by section 223(d) of the Social Security Act) which began before his twenty-second birthday").

### IV. Law & Analysis

#### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245

F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

19

**B.      First Assignment of Error: The ALJ Properly Evaluated Mental Functioning**

In her first assignment of error, Ms. Tadijanac argues that the ALJ erred in evaluating her mental functioning because the social interaction limitations in the mental RFC lack the support of substantial evidence and the ALJ did not properly evaluate the opinion evidence.  (ECF Doc. 7, pp. 12-19; ECF Doc. 10, pp. 1-4.)  More specifically, she argues that "the ALJ failed to provide legally valid and factually supported reasons for rejecting the greater limitations in social interaction" contained in the opinions of Drs. Rozenfeld, Castro, VanEstenberg, and Tanley.  (ECF Doc. 7, pp. 14-19; ECF Doc. 10, pp. 1-4.)  In response, the Commissioner argues that the social interaction limitations in those opinions are consistent with the mental RFC adopted by the ALJ and that the ALJ adequately explained why he did not incorporate an RFC limitation requiring a remote or socially isolated position.  (ECF Doc. 9, pp. 7-9.)

**1.      Framework for Assessing the RFC and Medical Opinion Evidence**

A claimant's RFC "is the most [she] can still do despite [her] limitations."  20 C.F.R. § 416.945(a)(1).  An ALJ must assess the "residual functional capacity based on all the relevant evidence in [the] case record," *id.*, such as: medical history; medical signs and laboratory findings; effects of treatment; reports of daily activities; lay evidence; recorded observations; medical source statements; symptoms; evidence from attempts to work; need for a structured living environment; and work evaluations, *see* Social Security Ruling (SSR) 96-8p, *Assessing Residual Functional Capacity in Initial Claims*, 61 Fed. Reg. 34474, 34477 (July 2, 1996).

"The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician," *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)).  Accordingly, an ALJ is "not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding."  *Id.*  Even

20

where an opinion was given great weight under prior regulation, the Sixth Circuit held "there [was] no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor [was] the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). But where an ALJ's RFC assessment "conflicts with an opinion from a medical source," he "must explain why the opinion was not adopted." SSR 96–8p, 61 Fed. Reg. at 34478; *see Fleischer*, 774 F. Supp. 2d at 881.

Under applicable regulations, ALJs need "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 416.920c(a); *see Sallaz v. Comm'r of Soc. Sec.*, No. 23-3825, 2024 WL 2955645, at *5 (6th Cir. June 12, 2024) (quoting 20 C.F.R. § 404.1520c(a)). However, they must evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation. 20 C.F.R. § 416.920c. Those five factors include supportability, consistency, relationship with the claimant, specialization, and other factors; but the most important factors are supportability[2] and consistency.[3] 20 C.F.R. §§ 416.920c(a), 416.920c(b)(2), 416.920c(c)(1)-(5). ALJs must therefore explain how they considered consistency and supportability but need not explain how they considered other factors. 20 C.F.R. § 416.920c(b)(2).

In reviewing an ALJ's medical opinion analysis, courts must consider whether the ALJ: considered the full record in assessing the persuasiveness of the opinion; appropriately articulated his reasons for finding the opinion unpersuasive; and made findings supported by

---

[2] "Supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in his or her opinion. *See* 20 C.F.R. § 416.920c(c)(1).

[3] "Consistency" is the extent to which a medical source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record. *See* 20 C.F.R. § 416.920c(c)(2).

21

substantial evidence.  *See* 20 C.F.R. § 416.920c (governing how ALJs consider and articulate findings re: medical opinions); 20 C.F.R. § 416.920(e) (findings re: RFCs will be "based on all the relevant medical and other evidence" in the case record); *see also Blakley*, 581 F.3d at 405.

### 2.    The ALJ Properly Evaluated the Medical Opinion Evidence and Adopted Social Interaction Limitations That Are Supported by Substantial Evidence

In assessing Ms. Tadijanac's RFC, the ALJ found that she could "have occasional and superficial contact with the public, with superficial defined as not involving persuasion, evaluation, negotiation, conflict resolution, or anything more than the straight-forward exchange of information." (Tr. 23.)  In her first assignment of error, Ms. Tadijanac contends that the ALJ's findings regarding social interaction are not supported by substantial evidence, and that the ALJ failed to properly evaluate the related medical opinions of the state agency psychological consultants and psychological consultative examiners.  (ECF Doc. 7, pp. 14-19; ECF Doc. 10, pp. 1-4.)  The crux of Ms. Tadijanac's first assignment of error is that "the opinions of Drs. Tanley and Vanestenberg contain social interaction limitations consistent with the need to work in isolation" (ECF Doc. 7, pp. 15-16) and the ALJ erred in rejecting that more restrictive limitation (*id*. at pp. 14-19; ECF Doc. 10, pp. 1-4).  Before turning to Ms. Tadijanac's various arguments in support of her first assignment of error, the undersigned considers the ALJ's evaluation of the medical opinions relating to Ms. Tadijanac's mental health impairments.

As to the state agency psychological consultants' opinions, the ALJ explained:

The State agency psychological consultants at the initial and reconsideration level opined that the claimant remains capable of completing simple and detailed work-related tasks; can relate on a superficial level with occasional public contact; and would be suitable for work that does not require changing tasks from day to day, but rather has a fairly regular set of job duties and expectations. These opinions are generally supported by the bulk of the objective medical evidence in the record, which shows complaints of depression and anxiety and difficulty concentrating with some thoughts of suicide, with exam findings of depressed and anxious mood

22

and affect with some rapid speech. However, exams were otherwise generally normal and the claimant herself reported significant benefit to her mental condition from prescription medication and therapy. <u>The language used in the prior administrative medical findings with respect to brief and superficial interaction is not vocationally defined and thus does not adequately articulate the limitation for use in an RFC assessment. I find the mental opinions persuasive insofar as a moderate limitation in interacting with others;</u> concentrating, persisting or maintaining pace; and adapting or managing oneself, <u>is supported by the broader record. But the record is not supportive of a need for social isolation as alleged by the claimant. Indeed, neither of the consultative examiners at Exhibits 6F and 9F found such a need for social isolation. I have adjusted and defined some of the language therein to use vocationally relevant terms with respect to</u> duration of attention and <u>"superficial contact" in compliance with the Act.</u>

(Tr. 28-29 (emphasis added).)

As to the psychological consultative examiner opinions, the ALJ explained:

I considered the opinion of psychological consultative examiner, James C. Tanley, Ph.D. (Exhibit 6F/4). Dr. Tanley opined that the claimant had no significant limitation in understanding, remembering, or carrying out instructions; if her panic problems were to worsen that would negatively impact her ability to concentrate, persist, or maintain pace; <u>she would be at some risk trying to deal with the social aspects of work</u>; and panic problems could lower her frustration tolerance and put her at some degree of risk for the pressures of work. This opinion was made after a thorough evaluation of the claimant. <u>It is persuasive insofar as it suggests</u> no limitation in the ability to understand, remember, or carry out information and <u>some limitation in the other mental domains. However, the limitations identified therein are phrased in vague and conditional language (<i>e.g.</i> "some" risk and "if her panic problems were to worsen") and are thus of limited value and not persuasive overall. It is notable, however, that there is no indication in this opinion that the claimant would need to be</u> off task, absent, or <u>socially isolated in the workplace.</u>

I considered the opinion of psychological consultative examiner, Andrea VanEstenberg, Ph.D. (Exhibit 9F). Dr. VanEstenberg opined that the claimant is capable of comprehending and completing simple routine tasks, but she may have difficulty with more complicated tasks; no more than mild impairment was identified in attention and concentration; <u>no specific social limitation was noted, though she did report social difficulties regarding avoidance and anxiety</u>; and <u>she is expected to respond to typical and expected work stressors in a more solitary position</u> with a highly simplistic and repetitive task and <u>her ability to cope with the stress and pressures associated with day-to-day basic work activity would not be compromised with a highly simplistic and repetitive single-step task in a more socially isolated or remote position.</u> Similar to the opinion above, this opinion was made after a thorough evaluation of the claimant. <u>This opinion is not persuasive, as again, it is phrased in vague and conditional language</u>, and the limitation to

23

completing more complex tasks is not supported by the concurrent examination showing her mental content was normal and she was oriented and could track the flow of conversation without distraction; her mental functioning was average; and her insight and judgment were unremarkable. It is also internally inconsistent insofar as it suggests no specific social limitation and then also suggests that the claimant could benefit from a more socially isolated or remote position. Nor is the opinion consistent with either the opinion of Dr. Tanley or the State agency consultants identified above. For these reasons, this opinion is not persuasive overall.

(Tr. 29 (emphasis added).)

Ms. Tadijanac first argues that the ALJ erred in his analysis of the medical opinions of state agency consultants Drs. Rozenfeld and Castro because he "failed to provide legally valid and factually supported reasons for rejecting greater limitations in social interaction." (ECF Doc. 7, p. 14.) The ALJ explained in his analysis of those opinions that "the record is not supportive of a need for social isolation as alleged by the claimant," and further that "neither of the consultative examiners . . . found such a need for social isolation." (Tr. 28.) Ms. Tadijanac argues that this finding was not factually supported because: (1) consultative examiner Dr. Tanley "assessed social interaction limitations," which state agency consultant Dr. Rozenfeld found "generally supported"; and (2) consultative examiner Dr. VanEstenberg found Ms. Tadijanac "'is expected to respond to typical and expected work stressors in a more solitary position with a highly simplistic and repetitive task,'" a medical opinion state agency consultant Dr. Castro found generally to be "more persuasive as it is consistent with and supported by exam findings." (ECF Doc. 7, pp. 14-15 (citing Tr. 71, 106, 516, 545 (emphasis removed)).)

The simple question before this Court is whether the ALJ's findings were supported by substantial evidence. Looking first at Dr. Tanley's consultative examination report, which opined that Ms. Tadijanac "made an unremarkable social presentation" but "would likely be at some risk trying to deal with the social aspects of work" (Tr. 516), the undersigned concludes

24

that there was substantial evidence to support the ALJ's conclusion that Dr. Tanley's opinion did not find "a need for social isolation" (Tr. 28).  Dr. VanEstenberg also noted that Ms. Tadijanac "made an unremarkable social presentation" in her examination, but opined that "she is expected to respond to typical and expected work stressors in a more solitary position with a highly simplistic and repetitive task." (Tr. 545.)  In assessing whether substantial evidence supported the ALJ's conclusion that Dr. VanEstenberg did not find "a need for social isolation" (Tr. 28), it is notable that the regulations define a "medical opinion" as "a statement from a medical source about what [a plaintiff] can still do despite [her] impairment(s) and whether [she] ha[s] one or more impairment-related limitations or restrictions[.]" 20 C.F.R. § 416.913(a)(2).  While Dr. VanEstenberg offers an opinion about what Ms. Tadijanac "can still do"—i.e, work "in a more solitary position" (Tr. 545)—she does not opine that Ms. Tadijanac can *only* work in such a position, nor does she define what constitutes a "*more* solitary position."   The ALJ found Dr. VanEstenberg's opinion "not persuasive" because it was "phrased in vague and conditional language," characterizing the relevant finding as no more than a "suggest[ion] that the claimant could benefit from a more socially isolated or remote position."  (Tr. 29.)  In this context, the undersigned concludes that substantial evidence supported the ALJ's conclusion that Dr. VanEstenberg did not find "a need for social isolation" in her opinion.  (Tr. 28.)

Ms. Tadijanac next argues that the ALJ "failed to provide a valid reason for rejecting Dr. Van[E]stenberg's assessment of greater limitations." (ECF Doc. 7, p. 15.)  This argument is not supported.  As noted above, the ALJ found the opinion "not persuasive" because it was "phrased in vague and conditional language" (Tr. 29), which is an accurate description of an opinion that found Ms. Tadijanac "is expected to respond" to work stressors "in a more solitary position" and cope with stress and pressure "in a more socially isolated or remote position" (Tr. 545).  Dr.

25

VanEstenberg did not find she could *only* respond to stress or pressure in a socially isolated or remote position, and did not define what constitutes a "*more* socially isolated or remote position." Courts have recognized that the "vagueness of a medical opinion is a proper basis on which to afford it less weight." *See, e.g., Ackles v. Comm'r of Soc. Sec.*, 470 F. Supp. 3d 744, 747 (N.D. Ohio 2020) (citing *Gaskin v. Comm'r of Soc. Sec.*, 280 F. App'x 472, 476 (6th Cir. 2008)). Here, the evidence supported the ALJ's conclusion that Dr. VanEstenberg did not find "a need for social isolation" in her opinion (Tr. 28), but simply indicated that Ms. Tadijanac "would benefit from" a more isolated position (Tr. 29). Thus, there is no clear conflict between Dr. VanEstenberg's medical opinion and the social limitations adopted by the ALJ in the mental RFC, and therefore there is no clear requirement under SSR 96–8p that the ALJ "must explain why the opinion was not adopted." SSR 96–8p, 61 Fed. Reg. at 34478.

Further, even if there were a conflict sufficient to trigger SSR 96–8p, the undersigned finds the ALJ's explanation sufficient to comply with that standard. In addition to accurately highlighting the "vague and conditional" language of the opinion, the ALJ also found the opinion "internally inconsistent insofar as it suggests no specific social limitation and then also suggests that the claimant could benefit from a more socially isolated or remote position." (Tr. 29.) This observation is supported by the evidence, since Dr. VanEstenberg found Ms. Tadijanac "made an unremarkable social presentation in this virtual setting" when opining as to her limitations in "responding appropriately to supervision and to coworkers in a work setting," but indicated Ms. Tadijanac would benefit from "in a more solitary position" when asked to opine as to limitations "in responding appropriately to work pressures in a work setting." (Tr. 545.) Thus, the ALJ provided valid reasons supported by substantial evidence when he found Dr. VanEstenberg's opinion "not persuasive" and declined to include a social isolation limitation in the RFC.

Ms. Tadijanac also argues that the ALJ's "rejection of the greater social interaction limitations assessed by" the two consultative examiners was in error because it was "based upon the terminology used in their opinions rather than an inconsistency with the record." (ECF Doc. 7, p. 15.)  This argument clearly fails.  The ALJ accurately criticized the terminology used in both consultative examiners' medical opinions as "vague and conditional," and therefore "of limited value and not persuasive overall." (Tr. 29.)  As discussed above, the ALJ appropriately concluded that the vague and conditional language used in Dr. VanEstenberg's opinion meant she merely opined that Ms. Tadijanac "could benefit from a more socially isolated or remote position" (*id.*), not that Ms. Tadijanac had "a need for social isolation" (Tr. 28).  Thus, the ALJ did not use Dr. VanEstenberg's "terminology" as a basis to "reject[] . . . greater social interaction limitations," but rather explained that the result of Dr. VanEstenberg's use of vague and conditional language was a failure to explicitly articulate greater social interaction limitations.

The same conclusion applies to Dr. Tanley's opinion that Ms. Tadijanac "would likely be at *some* risk trying to deal with social aspects of work" despite her "unremarkable social presentation." (Tr. 516 (emphasis added).)  The ALJ not only highlighted the "vague and conditional" nature of the phrase "'some' risk," but also noted that Dr. Tanley's opinion contained "no indication . . . that the claimant would need to be . . . socially isolated in the workplace." (Tr. 29.)  Thus, again, the ALJ did not reference "terminology" as a reason to reject "greater social interaction limitations," but rather as a way of explaining that Dr. Tanley's medical opinion did not articulate any such greater social interaction limitations.

Ms. Tadijanac also asserts that the ALJ erred when he found the psychological opinions[4] "persuasive insofar [as] the findings are consistent with the RFC finding," arguing that such

---

[4] Although Ms. Tadijanac addresses this argument generally to all four psychological opinions, she only cites language from the ALJ's discussion of the state agency opinions and Dr. Tanley's opinion.  (ECF Doc. 7, p. 16.)

reasoning shows the ALJ "'determined the RFC before reviewing the state agency consultants' opinions.'" (ECF Doc. 7, p. 16 (citation omitted).)  This argument is not supported by the record.  The ALJ did not find the opinions persuasive only to the extent they were "consistent with the RFC finding."  Instead, he found the state agency psychological consultants' opinions "persuasive insofar as a moderate limitation in interacting with others; concentrating, persisting or maintaining pace; and adapting or managing oneself, is supported by the broader record." (Tr. 28.)  He then explained that he found the opinions "generally supported by the bulk of the objective medical evidence in the record, which shows complaints of depression and anxiety and difficulty concentrating with some thoughts of suicide, with exam findings of depressed and anxious mood and affect with some rapid speech[,]" but noted that the "exams were otherwise generally normal and the claimant herself reported significant benefit to her mental condition from prescription medication and therapy." (*Id*.)  The ALJ also found Dr. Tanley's opinion "persuasive insofar as it suggests no limitation in the ability to understand, remember, or carry out information and some limitation in the other mental domains[,]" but explained that the "limitations identified therein are phrased in vague and conditional language . . . and are thus of limited value and not persuasive overall." (Tr. 29.)  Thus, the ALJ found the psychological opinions generally consistent with certain levels of mental functioning, which he also found were supported by the record; he did not simply find the opinions consistent "with the RFC."

Ms. Tadijanac's argument that the consultative examiners' use of "conditional language" was consistent with her own "anticipated increased symptoms and decreased functioning within a competitive work environment" (ECF Doc. 7, p. 17) does not change the analysis.  The problem with a medical source's use of vague or conditional language in an opinion is not the

---

The omission of Dr. VanEstenberg's opinion from this argument appears appropriate, since the ALJ did not find that opinion "persuasive insofar as" it suggested certain levels of limitation in mental functioning.  (*See* Tr. 29.)

believability of that opinion.  The problem is that such an opinion gives the ALJ very little tangible assistance in developing an RFC that clearly articulates "the most [the plaintiff] can still do despite [her] limitations," as required by the regulations.  20 C.F.R. § 416.945(a)(1).

Ms. Tadijanac's additional assertion that her normal mental status examination findings at the consultative examinations "do[] not represent [her] ability to function in a competitive work situation" because the examinations "were performed by video while Plaintiff was in her own home" (ECF Doc. p. 19) also does not change the analysis.  As discussed above, the ALJ considered Ms. Tadijanac's subjective complaints, activities of daily living, treatment records, consultative examination findings, and the four psychological opinions in determining Ms. Tadijanac's mental RFC, as required by the regulations.  *See* 20 C.F.R. § 416.945(a)(1); SSR 96–8p, 61 Fed. Reg. at 34477.  There is no indication that the ALJ gave inappropriate weight to the normal clinical findings at the consultative examinations, and Ms. Tadijanac has failed to show that the ALJ's findings lacked the support of substantial evidence.

Finally, to the extent the ALJ found Dr. VanEstenberg's opinion to be "insufficient or internally inconsistent," Ms. Tadijanac asserts that he was "required to 'contact the medical source who performed the consultative examination, give an explanation for [the] evidentiary needs, and ask that the medical source furnish the missing information or prepare a revised report.'"  (ECF Doc. 7, p. 19 (quoting 20 C.F.R. § 404.1519p(b)).)  While the applicable regulations do state that a consultative examiner will be contacted to "furnish . . . missing information or prepare a revised report" "[i]f the report is inadequate or incomplete," 20 C.F.R. § 416.919p(b), the regulations also provide that "[t]he absence of a medical opinion in a consultative examination report will not make the report incomplete," 20 C.F.R. §

29

416.919n(c)(6);[5] *see also Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 122 (6th Cir. 2016) ("[A] consultative examiner's report is not rendered incomplete by the absence of a statement about what a claimant can still do despite his limitations.") (citing 20 C.F.R. § 416.919n(c)(6)). Since the insufficiencies or internal inconsistencies referenced by Ms. Tadijanac pertain to medical opinion findings (*see* Tr. 29), the record does not support a finding that the ALJ committed reversible error when he failed to request a revised consultative examination report. *See also Troyan v. Comm'r of Soc. Sec.*, No. 1:24-CV-02040-DAP, 2025 WL 2437255, at *12 (N.D. Ohio Aug. 25, 2025) (finding an ALJ's conclusion that an opinion was vague "d[id] not render the examination report 'incomplete' or 'inadequate'" for purposes of requiring a revised report), *report and recommendation adopted,* No. 1:24-CV-02040, 2025 WL 2605401 (N.D. Ohio Sept. 9, 2025).

For the reasons set forth above, the undersigned concludes that Ms. Tadijanac has not met her burden to show that the ALJ's analysis of the psychological opinion evidence or mental RFC findings lacked the support of substantial evidence, were inadequately explained, were based on inaccurate findings, or failed to build a logical bridge between the evidence and the result. Accordingly, the undersigned finds the first assignment of error to be without merit.

## C.   Second Assignment of Error: The ALJ Properly Evaluated Plaintiff's Subjective Allegations

In her second assignment of error, Ms. Tadijanac argues that the ALJ erred in evaluating her symptoms pursuant to Social Security Ruling 16-3p because he failed to "explain why

---

[5] The "[e]lements of a complete consultative examination" include: major or chief complaints; the history of major complaints; a description and disposition of pertinent "positive" and "negative" findings based on history, examination, and laboratory tests relating to major complaints; the results of laboratory and other tests; a diagnosis and prognosis for impairments; and some explanation or comment on major complaints and any other abnormalities. 20 C.F.R. § 416.919n(c)(1)-(5), (7).  While a medical opinion is "ordinarily request[ed]," the absence of such an opinion will not make the consultative examination report incomplete.  20 C.F.R. § 416.919n(c)(6).

Plaintiff's allegations regarding bathroom breaks w[ere] inconsistent and should not be credited." (ECF Doc. 7, p. 20.)  She contends that her impairments "would reasonably cause [her] to be off task, absent more than six days per year, and require additional breaks," and notes that the VE testified that it would be work preclusive "if an individual is consistently taking additional bathroom breaks."  (*Id*.)  In response, the Commissioner argues that the ALJ appropriately evaluated Ms. Tadijanac's subjective complaints and adequately explained why he found they were not entirely consistent with the record.  (ECF Doc. 9, pp. 9-11.)

### 1. Legal Framework for Evaluation of Subjective Symptoms

"[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability."  *Jones*, 336 F.3d at 476; *see also* 20 C.F.R. § 404.1529(a) and SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 82 Fed. Reg. 49462, 49463 (Oct. 25, 2017) (explaining that statements of symptoms alone are not sufficient to establish a physical or mental impairment or disability).

Under the two-step process to assess the limiting effects of symptoms, the first step is to determine whether there is a medically determinable impairment that could reasonably be expected to produce the symptoms.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If there is such an impairment, the second step is to evaluate of the intensity and persistence of the symptoms to determine the extent to which they limit the performance of work-related activities.  *See id*.

In analyzing the second step, an ALJ should consider the objective medical evidence, subjective complaints, information about the claimant's prior work record, and information from medical and non-medical sources.  82 Fed. Reg. at 49464-49466; 20 C.F.R. § 416.929(c)(3). Relevant factors include daily activities, types and effectiveness of medications, treatment to

31

address symptoms, and other factors concerning functional limitations and restrictions due to pain or other symptoms.  *Id.*  An ALJ need not discuss all regulatory factors he considers, only those he finds pertinent to the case.  82 Fed. Reg. at 49467.  But the ALJ's analysis "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  *Id.*

**2.        The ALJ Appropriately Evaluated Plaintiff's Subjective Symptoms**

In challenging the ALJ's analysis of her subjective complaints, Ms. Tadijanac asserts that "the ALJ did not provide a rationale why Plaintiff's allegations regarding the frequency of bathroom use were rejected" and that "there is no analysis of Plaintiff's allegations relating to bathroom breaks."  (ECF Doc. 7, pp. 21-22.)  A review of the ALJ's analysis reveals a detailed discussion relevant to her ulcerative colitis symptoms, including her need to use the restroom.

The ALJ summarized the following subjective complaints relevant to ulcerative colitis:

> [Ms. Tadijanac] has flares of ulcerative colitis at random, which last a few weeks at a time followed by about a week or so of downtime. These occur intermittently about once every month. She would use the bathroom approximately 8 to 10 times a day during a flare up. She has been able to control these flares with infusion medication most of the time. She has had difficulty getting her medication covered by insurance. At the time of the alleged onset date, she was getting very sick, having severe diarrhea and bleeding with bowel movements, and was having difficulty eating food. She was vomiting, shaking, and sweating. She had lost 60 pounds. She has gone to the emergency department due to these symptoms.

(Tr. 24.)  He then concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [the] decision."  (Tr. 25.)

In support, the ALJ provided a detailed summary of Ms. Tadijanac's treatment records for ulcerative colitis, beginning with the following summary:

32

> With respect to the claimant's ulcerative colitis, the record shows some emergency department visits due to abdominal pain, nausea, and vomiting during the period at issue. Exams showed tenderness in the abdomen. Imaging was generally either mild or unremarkable with respect to ulcerative colitis. The condition was noted to be in remission in mid-2023. She did report some significant benefit from her medication regimen including infusions and mesalamine. Indeed, in the more recent record intermittent steroids and rectal mesalamine were able to control her symptoms.

(Tr. 25.)  The ALJ then outlined the specific details of Ms. Tadijanac's treatment records, including: emergency room visits in September 2022; continued treatment in October 2022, with discussion of medications, flare ups, and complaints regarding frequent bathroom visits; an emergency room visit in January 2023; treatment records later in January 2023 noting she was doing "amazingly well" on her medications; records indicating her condition was in remission in June 2023; emergency room treatment and infusions in August 2023; an emergency room visit in 2024; intermittent treatment in 2024, including an emergency room visit in early-2024 relating to an ulcerative colitis flare.  (Tr. 25-26.)  This discussion included examination findings that were normal, aside from abdominal tenderness, and imagery that was normal, aside from mild findings such as "diffuse" or "mild" inflammation and "mild wall thickening."  (*Id.*)  The ALJ then returned to consideration of Ms. Tadijanac's ulcerative colitis symptoms when he found the state agency medical consultant's reconsideration opinion to be supported by the medical evidence of record, explaining:

> No further physical limitation is supported, including any need to be off task or absent, given the reported management of symptoms when the claimant was compliant with medication, infusion, and physical therapy treatment, and the intermittent nature of the claimant's severe complaints requiring emergency department visits, at least one of which occurred in a context of a steroid taper. Nor does the diagnostic imaging/testing support the need to be off task or absent regularly, given the mild to normal CT findings, for example.

(Tr. 28.)

Considering the above-described discussion of Ms. Tadijanac's ulcerative colitis symptoms and treatment, the undersigned does not find merit in Plaintiff's arguments that "the

33

ALJ did not provide a rationale why Plaintiff's allegations regarding the frequency of bathroom use were rejected" or that "there is no analysis of Plaintiff's allegations relating to bathroom breaks." (ECF Doc. 7, pp. 21-22.) The ALJ explained that the condition involved intermittent flares, was demonstrated by only mild or minimal abnormal examination findings and imagery, went into remission at least once, and sometimes improved with medication. (Tr. 24-26, 28.) It also bears mention that neither the parties nor the ALJ identified more than a single medical record (in October 2022) where Ms. Tadijanac complained to providers regarding the frequency of her restroom usage. (*See* Tr. 448.) In this context, the ALJ's analysis provided an adequate rationale for discounting Plaintiff's allegation that she would be off task due to her symptoms.

Ms. Tadijanac specifically challenges the ALJ's analysis because he relies in part on a medical record indicating that her ulcerative colitis was in remission in June 2023. (ECF Doc. 7, p. 22.) She argues that the remission lasted only a short period because she was first noted to be in remission on June 8, then went to the emergency room on June 29, 2023. (*Id.*) Conversely, the Commissioner argues Ms. Tadijanac's period of remission lasted eight months, since the most recent flare before her noted remission was in January 2023, and her first emergency visit for a flare following the noted remission was in August 2023. (ECF Doc. 9, p. 10.) The Commissioner's argument is consistent with the evidence, since the June 29, 2023 emergency room visit referenced by Plaintiff was for complaints of "a fever[] and muscle tightness in the neck and shoulders," resulting in a diagnosis of acute torticollis. (Tr. 801, 807.)

Ms. Tadijanac also contends that the ALJ failed to identify evidence to support his finding that Plaintiff had "significant benefit from her medication regimen including infusions and mesalamine." (ECF Doc. 7, p. 23 (citing Tr. 25).) But the ALJ specifically noted both Dr. Thomae's observation in January 2023 that Ms. Tadijanac had "done 'amazingly well' with oral

34

mesalamine" (Tr. 25 (citing Tr. 520)) and her own hearing testimony that the infusions were helpful (Tr. 24; *see* Tr. 47, 50).  Ms. Tadijanac further asserts that additional medical records reflecting continued symptoms and/or flares despite treatment with medications "contradict [the ALJ's] uncited findings" regarding the benefit of her medications.  (ECF Doc. 7, pp. 23-24.)  But the undersigned concludes that the record contains substantial evidence to support the ALJ's findings.  For example, while Ms. Tadijanac's symptoms persisted, the record also shows that medication helped with symptom management (Tr. 25-26, 387, 520, 523, 1182), and that imaging remained generally mild or unremarkable (Tr. 25, 448, 458, 899-901, 912, 1006, 1188).  Even if substantial evidence supported Ms. Tadijanac's interpretation of the evidence, this Court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

Finally, Ms. Tadijanac argues that the ALJ's citation to certain activities of daily living "do not contradict Plaintiff's allegations that she required bathroom breaks throughout the day" because the relevant activities could be performed while using the restroom as needed.  (ECF Doc. 7, p. 24.)  But this argument does not change the analysis, since Plaintiff's activities of daily living are just one of the considerations discussed in the subjective symptom analysis, as is appropriate under the regulations.  82 Fed. Reg. at 49464-49466; 20 C.F.R. § 416.929(c)(3).

"'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen*, 800 F.2d at 545).  It was the ALJ's role to weigh the evidence and resolve conflicts in the evidence, including fluctuations in the severity of Ms. Tadijanac's symptoms, normal and abnormal examination findings, and varying degrees of responsiveness to

35

treatment.  *See Garner*, 745 F.2d at 387.  Ms. Tadijanac has not shown that the ALJ failed in this regard, or that the ALJ's findings lacked the support of substantial evidence.

For the reasons set forth above, the undersigned finds the ALJ appropriately considered Ms. Tadijanac's subjective allegations, adequately articulated his basis for finding her statements concerning the intensity, persistence, and limiting effects of her symptoms were not consistent with the evidence of record, and made a decision that was supported by substantial evidence. Accordingly, the undersigned finds second assignment of error to be without merit.

## V.      Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

June 12, 2026

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).